[Cite as *Tarjanyi v. Ohio Dept. of Ins.*, 2024-Ohio-5239.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| RYAN TARJANYI | : | |
| | : | |
| Appellant | : | C.A. No. 30085 |
| | : | |
| v. | : | Trial Court Case No. 2023 CV 03220 |
| | : | |
| OHIO DEPARTMENT OF INSURANCE | : | (Civil Appeal from Common Pleas |
| | : | Court) |
| Appellee | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 1, 2024

. . . . . . . . . . .

P.J. CONBOY,II, Attorney for Appellant

LINDSAY A. MILLER SCHLIE & CHRISTIE LIMBERT, Attorneys for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Ryan Tarjanyi appeals from a judgment of the Montgomery County Court of

Common Pleas, which affirmed the Ohio Department of Insurance's (ODI's) decision to

revoke his Ohio resident insurance agent license. For the following reasons, the trial court's judgment will be affirmed.

## I. Facts and Procedural History

{¶ 2} According to ODI's order on appeal, which confirmed and incorporated by reference the hearing officer's report and recommendation, Tarjanyi was licensed as a resident insurance agent in Ohio on December 7, 2009. Since May 2012, he has also been licensed as an investment company and variable contracts products representative (IR). In May 2016, he became registered as an IR through his association with Bankers Life Securities, Inc.

{¶ 3} On or about January 7, 2018, a Bankers Life client lodged a complaint against Tarjanyi. ODI began an investigation, which was assigned to Investigator Mathew Taylor. Three months later, Bankers Life notified ODI that Tarjanyi had been terminated for cause.

{¶ 4} In February 2021, Tarjanyi entered into a Financial Industry Regulatory Authority (FINRA) Letter of Acceptance, Waiver, and Consent (AWC), which became final on March 5, 2021. Under the terms of the letter of acceptance, Tarjanyi agreed not to associate with a FINRA member entity in any way. Tarjanyi did not report the AWC to ODI until he submitted a license renewal application on January 5, 2022.

{¶ 5} In March 2021, Tarjanyi submitted agent appointment applications to work with Safeco Insurance, AAA Insurance, Westfield Insurance, and Foremost Insurance Group. On his applications, he denied that he had had any relationship with an insurance company that terminated him for alleged misconduct and/or that he had been

involved as a party in an administrative disciplinary proceeding regarding his license. Tarjanyi knew, however, that he had been terminated for cause by Bankers Life in 2018 and was a party to the FINRA AWC in 2021.

{¶ 6} In mid-October 2021, Investigator Taylor sent Tarjanyi a subpoena for an interview to be held on November 10, 2021.  Before the date of the interview, Tarjanyi's attorney sought a postponement due to medical procedures Tarjanyi had scheduled. Taylor requested documentation to verify Tarjanyi's medical status.  Tarjanyi did not appear for the November 10 interview, but Tarjanyi's attorney informed Taylor that documentation would be forthcoming.  On November 22, 2021, his attorney sent a letter purportedly from a physician at UC Health concerning Tarjanyi's medical status.  Taylor was unable to verify that a physician by that name was licensed in Ohio.

{¶ 7} On July 20, 2022, ODI sent Tarjanyi a Notice for Opportunity for Hearing, alleging 11 violations of Ohio insurance law.  The allegations asserted that Tarjanyi had: (1) submitted of a forged annuity withdrawal form to Bankers Life in violation of R.C. 3905.14(B)(26) (Count One); (2)  been terminated for cause by Bankers Life for "intentionally providing false or misleading information to the home office, a regulator, or law enforcement personnel" in violation of R.C. 3905.14(B)(9) (Count Two); (3)  been subject to the FINRA AWC in violation of R.C. 3905.14(B)(17) (Count Three); (4)  failed to timely report the FINRA AWC to ODI in violation of R.C. 3905.22(A) (Count Four); (5) provided incomplete, incorrect, misleading, or materially untrue information on a license applications in violation of R.C 3905.14(B)(1) (Counts Five through Nine); (6) failed to appear for the November 10, 2021 interview without being released from the

subpoena in violation of R.C. 3905.14(B)(22) (Count Ten); and (7) submitted on November 22, 2021 a fraudulent document regarding his health in violation of R.C. 3905.14(B)(9) (Count Eleven).

{¶ 8} Tarjanyi requested a hearing, but it was repeatedly continued. Ultimately, he submitted a written response to ODI's accusations in lieu of a hearing. ODI elected to respond in writing, and the hearing was canceled. In its response, ODI withdrew Count One.

{¶ 9} In February 2023, after reviewing the written submissions, the hearing officer found that ODI had proven each of the ten counts on which it had proceeded. He recommended revocation of Tarjanyi's Ohio resident insurance agent license. Tarjanyi objected to the hearing officer's proposed order. However, the superintendent of ODI confirmed and approved the proposed order and revoked Tarjanyi's license.

{¶ 10} Pursuant to R.C. 119.12, Tarjanyi filed a notice of appeal in the Montgomery County Court of Common Pleas, alleging that the decision to revoke his resident insurance agent license was "not supported by reliable, probative and substantial evidence and [was] not in accordance with law." On February 29, 2024, the trial court overruled the appeal, finding that ODI's Final Order revoking Tarjanyi's insurance license was supported by reliable, probative, and substantial evidence.

{¶ 11} Tarjanyi appeals the trial court's judgment. His sole assignment of error states that the trial court erred in overruling his administrative appeal of ODI's revocation of his Ohio resident insurance agent license.

## II. Standard of Review

{¶ 12} R.C. 119.12 applies to appeals of decisions of licensing boards. *Clem D's Auto Sales v. Bur. of Motor Vehicles*, 2014-Ohio-951, ¶ 19 (2d Dist.). "Under R.C. 119.12, when a decision of a state board is appealed, a court of common pleas must decide whether the board's order was 'supported by reliable, probative, and substantial evidence and is in accordance with law.' " *Spitznagel v. State Bd. of Edn.*, 2010-Ohio-2715, ¶ 14, quoting R.C. 119.12. The trial court must give deference to the board's resolution of factual conflicts unless they are clearly unsupportable. *Clem D's Auto Sales* at ¶ 19, citing *Jackson v. Ohio Dept. of Rehab. & Corr.*, 2009-Ohio-896, ¶ 18 (2d Dist.).

{¶ 13} Generally, in the hearing of an administrative appeal, the trial court is confined to the record as certified to it by the agency. R.C. 119.12(L); *Seaquist v. Dayton*, 2023-Ohio-4563, ¶ 13 (2d Dist.). However, "the court may grant a request for the admission of additional evidence when satisfied that the additional evidence is newly discovered and could not with reasonable diligence have been ascertained prior to the hearing before the agency." R.C. 119.12(L).

{¶ 14} The trial court may affirm the order on appeal if it finds, "upon consideration of the entire record and any additional evidence the court has admitted, that the order is supported by reliable, probative, and substantial evidence and is in accordance with law." R.C. 119.12(N). "In the absence of this finding, it may reverse, vacate, or modify the order or make such other ruling as is supported by reliable, probative, and substantial evidence and is in accordance with law. *Id.*

{¶ 15} An appellate court's review is more limited than that of the trial court. We review the trial court's determination on whether the order was supported by reliable,

probative, and substantial evidence for an abuse its discretion. *Rossford Exempted Village School Dist. Bd. of Edn. v. State Bd. of Edn.*, 63 Ohio St.3d 705, 707 (1992). An abuse of discretion means that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When reviewing whether the board's or the trial court's order was in accordance with the law, our review is de novo. *Spitznagel,* 2010-Ohio-2715, at ¶ 14.

### III. Review of the Trial Court's Determination

{¶ 16} Tarjanyi claims that the trial court erred in determining that reliable, probative, and substantial evidence supported four conclusions: (1) he was terminated for cause from Bankers Life, (2) he failed to timely disclose the FINRA consent agreement to ODI, (3) he falsified carrier appointment applications, and (4) he failed to respond to ODI's subpoena and submitted false documents. Upon review, we find no abuse of discretion by the trial court.

### A. Termination for Cause

{¶ 17} Tarjanyi first challenges that trial court's determination that reliable, probative, and substantial evidence supported ODI's conclusion that Bankers Life terminated Tarjanyi for cause and that he was aware of this fact at all pertinent times (Count Two). He asserts that he was not notified by Bankers Life that his termination was for cause and that he reasonably relied on National Insurance Producer Registry (NIPR) reports from 2019 and 2021, neither of which reflected that his termination was for cause. Tarjanyi thus claims that he is being punished for failing to provide information of which he was not aware, and there is still a question of whether he was, in fact,

terminated for cause.

{¶ 18} Upon review of the administrative record, the trial court's conclusion was reasonable. In a letter dated April 9, 2018, and received by ODI on April 12, 2018, Bankers Life notified ODI that it had changed the termination for Tarjanyi to " 'cause' due to violations of his agent contract and the agent compliance guidelines. Specifically: Intentionally providing false or misleading information to the home office, a regulator or law enforcement personnel." Adm.R. Vol. 2, Doc. 17, Ex. 7.

{¶ 19} Later, on November 19, 2018, Tarjanyi authored a letter to Investigator Taylor regarding the complaint by the Bankers Life clients. On page 2 of the letter, Tarjanyi discussed his termination from Bankers Life. He stated that he was orally informed of his termination on the morning of March 28, 2018. He further wrote: "I was not informed that I was terminated for cause until I received a letter dated April 9th, 2018. I received it about two weeks after it was dated…The letter stated that my termination was changed to 'for cause', because I 'intentionally misled an investigator'." Adm.R. Vol. 2, Doc. 17, Ex. 9, p. 3, 5.

{¶ 20} Tarjanyi attached two letters he had received to his objections to the proposed order, neither of which stated that his dismissal was for cause. A March 28, 2018 letter from Bankers Life confirmed that his employment had been terminated and that his last workday was March 28. Adm.R. Vol. 2, Doc. 19, Ex. A. An April 9, 2018 letter from Bankers Life constituted written notification of the termination of his manager contract, to coincide with his departure as unit sales manager. Adm.R. Vol. 2, Doc. 19, Ex. B.

{¶ 21} Tarjanyi further points to two January 9, 2020 PBR reports from NIPR – one for Ohio, his resident license state (Exhibit 3), and the other for his non-resident license states (Exhibit 4). Those reports showed that Tarjanyi's appointment with Bankers Life was terminated. Although it appears that a reason for the termination could be provided, the "termination reason" field was left blank. Adm.R. Vol. 1, Doc. 14, Ex. 3-4.

{¶ 22} Despite Tarjanyi's evidence, the trial court reasonably found that reliable, probative, and substantial evidence supported ODI's conclusions that Tarjanyi was terminated for cause and was aware of that fact as of April 2018. Although the March 28 letter did not reference termination for cause, Bankers Life notified ODI in April 2018 that Tarjanyi's termination had been changed to "for cause." Tarjanyi's own written statements acknowledged that he had also received written notification from Bankers Life in April 2018 that Bankers Life had terminated him for cause, although apparently a different letter than the one he attached to his objections. While the NIPR reports did not state that Tarjanyi had been terminated for cause, they also did not indicate otherwise. In short, Tarjanyi's evidence did not refute ODI's evidence, and it did not require a different conclusion.

### B. Failure to Disclose FINRA Consent Agreement

{¶ 23} Second, Tarjanyi challenges the trial court's conclusion that reliable, probative, and substantial evidence supported ODI's determination that he failed to timely disclose the FINRA order to ODI (Count 4). In reaching its conclusion, the trial court pointed to Tarjanyi's own admissions and certified FINRA records.

{¶ 24} Count Four of ODI's notice alleged a violation of R.C. 3905.22(A), which

provides: "(A) An insurance agent shall provide notice to the superintendent of insurance of any administrative action taken against the agent in another jurisdiction or by another governmental agency having professional, occupational, or financial licensing authority *within thirty days after the final disposition of the matter.* The notice shall include a copy of the order, consent to order, or any other relevant legal document." (Emphasis added.)

{¶ 25} According to the FINRA AWC (Adm.R. Vol. 2, Doc. 14, Ex. 8), Tarjanyi first registered as an IR with FINRA in May 2012. He was registered as an IR through his association with Bankers Life between May 2016 and March 30, 2018. Tarjanyi ceased being associated with a FINRA member firm in 2020.

{¶ 26} In 2019, after Tarjanyi was terminated for cause from Bankers Life, FINRA opened an investigation into Tarjanyi's sale practices. During its investigation, FINRA interviewed Tarjanyi under oath. FINRA ultimately found that Tarjanyi had "provided inaccurate information during on-the-record testimony regarding a customer's execution of an annuity partial withdrawal form, in violation of FINRA Rules 8210 and 2010." Thereafter, Tarjanyi reached a settlement with FINRA, which barred him from associating with any other FINRA member in any capacity. By accepting the AWC, Tarjanyi neither admitted nor denied FINRA's findings. The AWC became final on March 5, 2021.

{¶ 27} Tarjanyi acknowledged that he did not report the FINRA AWC to ODI until he applied to renew his license in January 2022, approximately nine months later. In both his written argument in lieu of a hearing (Adm.R. Vol. 1, Ex. 14) and his objections to the proposed order (Adm.R. Vol. 2, Ex. 19), Tarjanyi claimed that his attorney had advised him that he was not required to inform ODI before then.

{¶ 28} On appeal, Tarjanyi again explains why he accepted an AWC from FINRA and states that he is "reserving the right to revisit the decision and potentially take legal action against FINRA for malicious prosecution." Tarjanyi also reiterates that his attorney told him that, because FINRA is a separate entity from ODI, he only needed to inform ODI of the AWC when he renewed his license. Tarjanyi contends that relying on the advice of his representative was not hiding or falsifying information.

{¶ 29} Although Tarjanyi does not point us to evidence in the administrative record, we note that Exhibit 5 to his written argument (Adm.R., Vol. 1, Ex. 14, Ex. 5) is the email exchange between Tarjanyi and his then-counsel. On February 17, 2021, Tarjanyi wrote, in part:

> I will read it [the AWC] over and sign it later today. I'm not super worried
>
> about the Ohio Department of Insurance. They will probably want me to
>
> do some type of explanation. My question, do I need to disclose now?
>
> How long will it take this to take [sic] for their side to approve?

Tarjanyi's attorney responded: "It could take a while, depending on the workload of Wells' [FINRA's senior counsel's] superiors. Regardless, there is no interim reporting obligation for DOI as there is for FINRA. It will be a question posed during your renewal app process."

{¶ 30} Tarjanyi does not dispute that he entered into an AWC with FINRA on March 5, 2021 (as alleged in Count Three), nor does he contend that he notified ODI of the consent agreement within 30 days, as required by R.C. 3905.22(A). He acknowledges that it was reported in January 2022. Even accepting that Tarjanyi failed to notify ODI

within 30 days based on the advice of counsel, the trial court did not abuse its discretion in finding that Tarjanyi's failure to timely notify ODI was supported by reliable, probative, and substantial evidence. ODI could have reasonably concluded that Tarjanyi's reason for failing to comply with the statute was not relevant to whether the violation had occurred.

### C. Falsified Carrier Appointment Applications

{¶ 31} Third, Tarjanyi challenges the trial court's determination that reliable, probative, and substantial evidence supported ODI's finding that he had provided false information in his carrier appointment applications (Counts Five through Nine).

{¶ 32} In March 2021, Tarjanyi submitted several carrier appointment applications. *See* Adm.R. Vol. 2, Doc. 17, Ex. 10-13. These included (1) an application submitted on March 5, 2021 for appointment as a producer with Safeco Insurance (Ex. 10); (2) an application submitted on March 5, 2021 for appointment as a producer with AAA and Hensley (Ex. 11); (3) an application submitted by Tarjanyi on March 10, 2021 for appointment as a producer with Westfield Insurance (Ex. 12); and (4) an application submitted on March 17, 2021 for appointment as a producer with Foremost Insurance Group (Ex. 13).

{¶ 33} Taylor requested copies of the applications as part of his investigation. Taylor Aff., ¶ 16. He discovered that on four of the applications, Tarjanyi denied that he had ever been terminated for cause, that he ever had an administrative action by a regulatory entity, or both.

{¶ 34} In upholding ODI's decision, the trial court noted that Tarjanyi knew about

the Bankers Life termination for cause "all the way back in April 2018, as he admitted to the Department in 2018. Furthermore, by March 2021, he had already begun the consent process with FINRA, meaning he knew he was a party to an "occupational licensing proceeding." The trial court also commented that ODI's hearing officer had noted that the "flurry" of carrier applications came right as Tarjanyi was about to be barred by FINRA.

{¶ 35} On appeal, Tarjanyi states that he did not falsify his applications but, instead, relied on his counsel's advice and the information available to him. He points to the termination letters he received from Bankers Life in March and April 2018 and the NIPR reports. In addition, Tarjanyi explains that he filed numerous applications at once because he had just accepted a position with AAA, which works with multiple insurance companies. He asserts that the timing of the applications and the AWC was coincidental. Tarjanyi further points to documentation showing that, once he became aware that ODI believed he had not answered the application questions truthfully, he made efforts to amend the applications. *See* Adm.R. Vol. 1, Doc. 14, Ex. 6-8.

{¶ 36} Upon review of the administrative record, the trial court's conclusion was not an abuse of discretion. Although Tarjanyi asserts that he relied on the letters from Bankers Life and the NIPR reports, there was other evidence, including written statements from Tarjanyi himself, demonstrating that he was aware in 2018 that he had been terminated for cause from Bankers Life. The evidence also reasonably supported the conclusion that Tarjanyi was attempting to conceal the FINRA AWC, despite Tarjanyi's alternative explanation. The fact that Tarjanyi tried to rectify the situation later

did not require a different conclusion. Rather, that evidence could reasonably be construed as an attempt to mitigate any negative consequence he might face.

**D. Failure to Respond to Subpoena and Submission of False Documents**

{¶ 37} Finally, Tarjanyi claims that the trial court erred in finding that reliable, probative, and substantial evidence supported ODI's conclusion that he had failed to comply with an ODI subpoena (Count 10) and that he submitted fraudulent and unauthenticated correspondence to ODI regarding his inability to appear for the subpoena (Count 11).

{¶ 38} It is undisputed that Tarjanyi was subpoenaed to appear for an investigative interview on November 10, 2021. *See* Adm.R. Vol. 2, Doc. 17, Ex. 14. Tarjanyi's attorney reached out to reschedule the interview, stating that Tarjanyi was not available to interview due to medical reasons. Adm.R. Vol. 2, Doc. 17, Taylor Aff., ¶ 22. On the morning of the interview, Taylor requested documentation to support Tarjanyi's inability to answer questions, indicating that he would consider Tarjanyi a "no show" if such documentation was not provided. Adm.R. Vol. 2, Doc. 17, Ex. 15. After additional email exchanges between Taylor and Tarjanyi's counsel, the interview was postponed while documentation was obtained.

{¶ 39} Tarjanyi's attorney ultimately provided a letter dated November 5, 2021, purportedly from Dr. Kammal Bari at UC Health. Adm.R. Vol. 2, Doc. 17, Ex. 15 & Taylor Aff., ¶ 23. The letter stated: "Mr. Tarjanyi is currently under my care and will be having surgery on November 23rd, 2021. At this point it is anticipated that Mr. Tarjanyi will need roughly 8 weeks of recovery time before he is able to return to his normal work duties.

This is solely an estimate and depending on his recovery could require a longer period before he is able to resume his daily duties."

**{¶ 40}** Taylor tried unsuccessfully to authenticate the doctor's note. According to Taylor's affidavit, he searched the State Medical Board of Ohio's licensing database to verify whether an individual named Kammal Bari was licensed as a physician in Ohio; his search yielded no results. Taylor Aff., ¶ 24. He also called the State Medical Board of Ohio to verify whether any individuals named Kammal Bari were licensed as doctors in Ohio; the representative for the Board stated that it had no record of an individual by that name. *Id.*, ¶ 25-26. Taylor contacted UC Health to determine whether any doctor at UC Health generated the letter. Adm.R. Vol. 2, Doc. 17, Ex. 16-17 & Taylor Aff., ¶ 27-29. UC Health confirmed that Tarjanyi was a patient. Taylor Aff., ¶ 30. It indicated, however, that it did not have a doctor on staff by the name of Kammal Bari, although it had a doctor with a similar name. *Id.*, ¶ 31-32. UC Health notified Taylor that the doctor on staff had not produced the letter that Tarjanyi's attorney had provided, and UC Health did not know where the letter had been produced. *Id.*, ¶ 33.

**{¶ 41}** On December 6, 2021, in a conference call between Tarjanyi's attorney, Taylor, and Taylor's supervisor, ODI notified Tarjanyi's attorney that the Bari letter appeared not to be genuine. *Id.*, ¶ 34. Tarjanyi and his attorney were provided an opportunity to validate the letter, but no information was provided. *Id.*, ¶ 35-37. Taylor stated that he received no additional medical records or correspondence from any medical provider regarding Tarjanyi's medical condition or inability to interview. *Id.*, ¶ 38.

**{¶ 42}** In his written response to the allegations and subsequent objections to the

proposed order, Tarjanyi stated that he had faced potentially life-threatening health problems in the fall of 2021 and, consequently, his attorney had contacted ODI and requested an extension until after the beginning of the new year. Adm.R. Vol. 1, Doc. 14; Adm.R. Vol. 2, Doc. 19. Tarjanyi indicated that his attorney acted on the assumption that Tarjanyi's health would continue to decline and ODI would back down; Tarjanyi stated that, when he requested the extension, he was not mentally or physically capable of undergoing intense questioning for an extended period of time. He asserted that he was not permitted to reschedule the interview after he had sufficiently recovered. Id.

{¶ 43} As to the falsification allegation, Tarjanyi stated that he had provided his attorney "notes from multiple physicians reflecting that he had a tumor on his liver and needed surgery." He also stated that he had signed numerous medical releases for his attorney and had provided his attorney contact information and medical records. He indicated that the surgeries were performed in the fall of 2021.

{¶ 44} Tarjanyi presented documentation after Taylor's investigation concluded. His written response to the allegations included a September 12, 2022 note from Leslie Pulver, who indicated that she began treating Tarjanyi for mental health on December 2, 2021. Adm.R. Vol. 1, Doc. 14, Ex. 9. Pulver wrote that he had previously received services through another provider, and "up until January 2021, Mr. Tarjanyi suffered from memory gaps that resulted from his recovery from alcohol and some of the medications that he was taking at that time." Id. She continued: "It is my opinion that the stress of preparing for and participating in defending himself in court would be detrimental to his mental health as he is still early in his recovery from alcohol."

**{¶ 45}** Tarjanyi attached surgical notes to his objections to the proposed order. Adm.R. Vol. 2, Doc. 19, Ex. C. Those notes pertained to his October 25, 2021 shoulder surgery and his November 23, 2021 surgery on his liver and pancreas. Exhibit C also included the note from Pulver, which had previously been provided.

**{¶ 46}** Tarjanyi did not provide any information authenticating the Bari letter. To the contrary, he stated in his objections that he did not know what it was or where it came from.

**{¶ 47}** Based on the record before us, we find no abuse of discretion in the trial court's conclusions. Assuming Tarjanyi's surgical notes are authentic, the evidence substantiated that he had serious physical health issues around the time of the scheduled November 10, 2021 interview. He provided evidence that he had shoulder surgery approximately 16 days before the scheduled interview and had additional surgery on his liver and pancreas in late November. Pulver's notes further indicated that serious mental health issues existed both before and after the interview date.

**{¶ 48}** However, none of Tarjanyi's documentation indicated that he had been unable to participate in the interview on November 10, 2021. The postoperative plan in the shoulder surgery notes listed only that Tarjanyi should wear a sling for comfort and initiate physical therapy. And while Tarjanyi required surgery on his liver and pancreas, there was nothing stating that his physical health pre-surgery precluded him from appearing for the interview. Pulver's note addressed his inability to participate in court proceedings as of September 2022. The trial court reasonably found that ODI had reliable, probative, and substantial evidence that Tarjanyi had failed, without justification,

to comply with ODI's subpoena to appear for the November 10 interview.

{¶ 49} Moreover, the trial court reasonably concluded that reliable, probative, and substantial evidence existed that Tarjanyi submitted fraudulent correspondence regarding his inability to appear for the subpoena. Tarjanyi's counsel provided Taylor a letter purportedly from Dr. Kammal Bari at UC Health. Taylor made efforts to authenticate the letter but learned that no such person was licensed in Ohio, no doctor by that name practiced at UC Health, and the Dr. Bari on staff did not provide the letter. The trial court reasonably concluded that the record supported the finding that Tarjanyi had provided a fraudulent letter.

{¶ 50} In summary, the trial court reasonably concluded that ODI's findings were supported by reliable, probative, and substantial evidence. Accordingly, Tarjanyi's assignment of error is overruled.

## IV. Conclusion

{¶ 51} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.